604 So.2d 783 (1992)
Willard Carl ROBERTSON, Petitioner,
v.
STATE of Florida, Respondent.
No. 77021.
Supreme Court of Florida.
July 16, 1992.
Rehearing Denied September 23, 1992.
*785 James B. Gibson, Public Defender, Michael S. Becker, James R. Wulchak and Barbara L. Condon, Asst. Public Defenders, Seventh Judicial Circuit; and Flem K. Whited, III of Lambert & Whited, Daytona Beach, for petitioner.
*786 Robert A. Butterworth, Atty. Gen. and Belle B. Turner, Asst. Atty. Gen., Daytona Beach, for respondent.
KOGAN, Justice.
We have for review Robertson v. State, 569 So.2d 861 (Fla. 5th DCA 1990), which certified the following questions of great public importance:
(A) May a chemical analysis performed in accordance with the approved methods contemplated by section 316.1933 be conducted under the supervision of a permittee by individuals not possessing [a Florida Department of Health and Rehabilitative Services ("HRS")] permit?
(B) Can the state introduce into evidence test results of blood samples taken at the request of law enforcement if the requirements of section 316.1933 are not satisfied? If so, upon proof of qualification of the person taking blood or conducting the test, can the state nonetheless rely on the provisions of section [] 316.1933 to prove a violation of section 316.193 or must the state introduce competent proof wholly independent of the statute?
Robertson v. State, 569 So.2d 861, 863-64 (Fla. 5th DCA 1990). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the first question in the negative; and we answer the second question with a qualified affirmative.
On July 2, 1988, four vehicles were involved in a collision, resulting in the death of Karen Deatherage. The accident was caused when a white truck attempted to pass another vehicle despite oncoming traffic. The truck was registered in the name of Willard Carl Robertson, the defendant below. One witness said that, immediately after the accident, he saw three men running around the truck, picking up beer cans and putting them into an ice chest.
Later, Robertson was located lying facedown in the grass some fifty to 100 feet from the scene. The other two men were not present. Robertson appeared to be unconscious, but later became belligerent. He had abrasions to the left shin, resulting in blood loss. Witnesses could find no apparent injuries to Robertson's head. At the time, Robertson was wearing short pants and had blue paint stains on his arm. (He was a painter.) According to the defense, Robertson also had red paint stains on his clothing.
After a two-hour search, police found the other two men. Both had head and knee injuries. At the time of the accident, both men were wearing long pants and had red paint stains on their clothing.
An examination of the truck revealed that the windshield had sustained two impacts from the inside. One was located in the center, to the immediate right of the driver's area, and the other was located at the far right.
The steering wheel was buckled up, and there was a dent nearby on the dashboard that appeared to be bloody. A trooper said he saw blood and human tissue on the emergency brake pedal. A blue paint stain was found on the steering wheel. A red paint stain was found on the dash on the passenger side. Two deep compressions in the dash in front of the passenger side showed clothing imprints. These dents appeared to correspond with the passengers' knees striking the dash.
While Robertson still was at the scene, Trooper Warren Peck approached him and asked about his involvement in the accident. Peck at this time was investigating a homicide. Upon questioning by Peck, Robertson stated that he had been walking down the side of the road and got hit. This statement later was introduced at trial.
Shortly after the accident, blood samples were taken from Robertson. These samples subsequently were tested at the direction of an investigating officer, based on her belief that Robertson was intoxicated. The test results varied from a low of.163 to a high of .20. The circumstances surrounding the drawing of the blood were described in the following terms by the officer:
Q. Were you present in the room during the time the blood was drawn?
A. Yes, sir, I was.
Q. Do you remember it clearly?

*787 A. Yes, sir, I do.
Q. What makes you remember this so clearly?
A. After  because of a very combativeness [sic], it was very hard to draw blood at the time. Because when you've got somebody laying there and trying to restrain them down, the nurse was having a very hard time finding a vein. She was having to get an arm band. There is three of us trying to  we finally put restraints on him and got blood drawn and she took it and handed the tubes after she sealed them and I sealed them in the blood kit.
The nurse also confirmed that "[t]he officer had to hold [Robertson] down" to draw blood. It thus is clear both from this testimony and the overall record that Robertson did not actually consent to the withdrawal of blood, nor was blood withdrawn for some medical purpose.[1] Rather, blood was withdrawn at the direction of the officer pursuant to the implied-consent provision of section 316.1933(1), Florida Statutes (1987),[2] in an attempt to gather evidence to prosecute Robertson for a DUI-related offense.[3]
At trial, the state had no direct evidence that Robertson was the driver of the truck. It relied entirely on the circumstantial evidence recited above.
During the middle of the trial, the state announced it needed to amend its witness list to include Dr. Wayne Duer. The state said it had just learned that Dr. Lynn Bowman (who was on the list) had not actually conducted the blood-alcohol test on Robertson's blood, but had merely supervised a test conducted by Dr. Duer. Defense counsel was permitted to depose the witnesses before the trial continued, and the trial court conducted a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla. 1971), and determined that no discovery violation had occurred.
Robertson then objected to the admission of the results of the blood alcohol tests on the ground that the person who performed the test, Dr. Duer, was not certified by HRS as required by statute at the times in question. The state argued that the requirements of the statute were satisfied because Dr. Duer's work was supervised by a licensed analyst, Dr. Bowman.
At the trial, Dr. Duer testified that he held a bachelor's degree in mathematics, a masters degree in organic chemistry, and a doctorate in physical chemistry. He had formerly taught analytical chemistry at the University of Florida and had worked in racehorse blood analysis for the State Department of Business Regulation for ten years.
Dr. Duer had been employed by the Florida Department of Law Enforcement since December, 1986 and had begun analyzing substances for alcohol content in July, 1988. Robertson's blood was received by Dr. Duer on July 6, 1988 and was tested on August 5, 1988.
Dr. Bowman testified that the testing was conducted as part of Dr. Duer's training. Dr. Bowman would tell Dr. Duer what to do. Then, Dr. Duer would obtain the results of the tests, and Dr. Bowman would review them. Dr. Bowman signed the laboratory report. While Dr. Duer was *788 conducting the test procedures, Dr. Bowman was in the same laboratory, observing Dr. Duer and speaking with him while the test was going on, although he was not in Dr. Duer's presence at all times.
The trial court found this procedure substantially complied with the statutory requirements but suggested to the state that, in the future, the FDLE should not do laboratory training in homicide cases. The district court affirmed on grounds the state had substantially complied with the DUI statutes, but it certified the two questions of great public importance.
As to the first certified question, we find that it must be answered in the negative. Under the plain terms of the statute, the person conducting the chemical analysis of blood must actually possess the HRS permit. The statute authorizing coercive testing in drunk-driving accidents involving death or serious injury uses the following language:
A chemical analysis of the person's blood to determine the alcoholic content thereof must have been performed substantially in accordance with methods approved by the Department of Health and Rehabilitative Services and by an individual possessing a valid permit issued by the department for this purpose. The Department of Health and Rehabilitative Services may approve satisfactory techniques or methods, ascertain the qualifications and competence of individuals to conduct such analyses, and issue permits which will be subject to termination or revocation at the discretion of the department.
§ 316.1933(2)(b), Fla. Stat. (1987) (emphasis added). Once a blood-alcohol test is validly taken under subsection 316.1933(2), the Florida Statutes then create a presumption that anyone with a blood-alcohol content of 0.10 percent or more is impaired. § 316.1934(2)(c), Fla. Stat. (1987). However, the presumption statute once again cautions:
A chemical analysis of a person's blood to determine alcoholic content or a chemical analysis of a person's breath, in order to be considered valid under the provisions of this section, must have been performed substantially in accordance with methods approved by the Department of Health and Rehabilitative Services and by an individual possessing a valid permit issued by the department for this purpose. Any insubstantial differences between approved techniques and actual testing procedures in any individual case shall not render the test or test results invalid.
§ 316.1934(3), Fla. Stat. (1987) (emphasis added).
We find this language plain and unambiguous. Under both statutes, the test "must have been performed ... by an individual possessing a valid permit." Id. While there are "substantial compliance" clauses and a separate "savings" clause in the case of section 316.1934(3), by their own terms these clauses apply only to the "methods approved by [HRS]" and the "approved techniques and actual testing procedures." There is no reference whatsoever to "substantial compliance" in connection with the licensing clause, nor does the statute contemplate that the test could be conducted under the supervision of one who possesses the permit.
In other words, the person conducting the test must (a) have the HRS permit and (b) substantially comply with the applicable HRS regulations. Since there is no statutory ambiguity here, we have no need to resort to rules of construction, nor may we vary the language beyond its plain meaning. Accordingly, we hold that the test conducted by Dr. Duer in this instance was not an authorized test within the meaning of subsections 316.1933(2)(b) and 316.1934(3), Florida Statutes (1987), because Dr. Duer did not himself possess the HRS permit.
The question remaining is whether Dr. Duer's test results are admissible on some independent basis. This question requires us to consider two earlier cases that have dealt with analogous issues  State v. Bender, 382 So.2d 697 (Fla. 1980), and State v. Strong, 504 So.2d 758 (Fla. 1987)  as well as the general legal principles underlying the applicable law.
*789 In Bender, the Court conducted a thorough analysis of Florida's "implied consent law"[4] and its relation to the earlier common law and other evidentiary principles governing the admissibility of expert testimony in a DUI-related prosecution. First, the Bender Court expressly recognized that the implied consent law includes an exclusionary rule prohibiting the use of blood-test results taken contrary to its core policies[5]:
The test results are admissible into evidence only upon compliance with the statutory provisions and the administrative rules enacted by its authority.
Id. Accord State v. Strong, 504 So.2d 758 (Fla. 1987); State v. Gillman, 390 So.2d 62 (Fla. 1980).
Second, Bender noted that, prior to the adoption of the implied consent law, scientific test results for intoxication were admissible
if a proper predicate established that (1) the test was reliable, (2) the test was performed by a qualified operator with the proper equipment and (3) expert testimony was presented concerning the meaning of the test.
Bender, 382 So.2d at 699. This predicate had to be established in each and every case. If the state failed to do so, the evidence was not admissible. Moreover, when the state attempted to establish the necessary predicate, the defense enjoyed an opportunity to rebut all of this evidence. If the defense introduced sufficient evidence to rebut any one of the elements of the predicate, then once again the expert evidence was not admissible. Id. Perhaps most significantly of all, the former procedure required the trial court to be the arbiter of what often was a dispute over arcane scientific principles.
The implied consent law altered this state of affairs. Now, once the state shows that the person conducting the test was licensed by HRS and substantially complied with the applicable regulations, a presumption is created that the evidence is admissible. In other words, the state's burden of establishing a predicate is simplified in the sense that the state no longer has to guess what factors a particular trial judge will require the state to prove before admitting the test results; nor is the trial court required to wade into a morass of arcane scientific challenges and counter-challenges. If the state follows the HRS "checklist," then the trial court's determination that the predicate has been established is clothed in a presumption of correctness.[6] Thus, one purpose of the implied consent law is "to ensure reliable scientific evidence for use in future court proceedings" by establishing uniform, approved procedures for testing. Id.
However, this is not the only purpose. In Bender we also noted that the law also was meant "to protect the health of those persons being tested, who by this statute have given their implied consent to these tests." Id. The Bender Court then noted that many jurisdictions have made their implied-consent laws the exclusive method of testing in this context. Id. Bender relied, for example, on the opinion in State v. Wallin, 195 N.W.2d 95 (Iowa 1972), which dealt with Iowa's implied consent law. The Wallin court also noted that the *790 Iowa law was meant to protect the health of those being tested under its provisions. Id. at 98 (citing State v. Shelton, 176 N.W.2d 159, 161 (Iowa 1970)).
A similar concern for the health of test subjects has underlain several other Florida cases that have considered the circumstances under which the implied consent law's exclusionary rule will be applied. In Gillman, we confronted a situation in which blood was taken from a DUI suspect by a person not expressly authorized to do so by the implied consent law. We held, however, that this procedure did not violate the law because the person had received a letter from HRS authorizing him to work temporarily as a clinical laboratory techinician  one of the categories of persons actually authorized to draw blood. This was true even though the person technically lacked the "license" to be a clinical laboratory technician, as required by the statute. The HRS letter, in other words, clearly was the equivalent of a license. Gillman, 390 So.2d at 63. In so holding, we concluded that this limited exception to the strict statutory language would not undermine the policies either of scientific accuracy or protecting the health of test subjects, since the person was working with authorization from HRS. Id. at 64.
Several cases from the district courts of appeal can be understood as resting on the same policies stated in Bender. For example, in some cases the district courts have suppressed evidence from blood samples drawn by persons who completely lacked authorization. E.g., Albritton v. State, 561 So.2d 19 (Fla. 5th DCA 1990); State v. Roose, 450 So.2d 861 (Fla. 3d DCA), review denied, 451 So.2d 850 (Fla. 1984). Similarly, such evidence has been suppressed where testing equipment was not properly maintained or stored. Donaldson v. State, 561 So.2d 648 (Fla. 4th DCA 1990), approved, 579 So.2d 728 (Fla. 1991); State v. Wills, 359 So.2d 566 (Fla. 2d DCA 1978). Clearly, the use of unauthorized persons to draw blood and the use of improperly maintained equipment could threaten the health of test subjects. Thus, on this basis, the exclusionary rule of the implied consent law requires that such evidence be suppressed.
In much the same vein, the courts generally have recognized exceptions to the implied consent law's exclusionary rule provided those exceptions are consistent with the policies underlying the law. For example, the Iowa court concluded in Wallin that compliance with the statute is not necessary (a) where consent to the test existed on some independent basis, or (b) to the extent that the defendant waived the rights provided by the statute. Wallin, 195 N.W.2d at 98. As to the first of these categories, it is clear that a person only needs the protection of the implied consent law if the testing provisions of that law actually are being invoked by the state. If the defendant has consented to the test, or consent is implied on some basis independent of the DUI laws, then the blood test falls wholly outside the scope of the implied consent law.[7] Likewise, a defendant has complete freedom to voluntarily waive the protections created by the statute.
The same is true of Florida's implied consent law. In Bender, for example, we stated that
where motor vehicle driver intoxication is not involved, the implied consent provision is inapplicable, and, consequently, the results of the blood alcohol tests are admissible into evidence without compliance with the administrative rules if the traditional predicate is laid which establishes the reliability of the test, the qualifications of the operator, and the meaning of the test results by expert testimony. None of the statutory presumptions can apply in the absence of compliance with the administrative rules.
Bender, 382 So.2d at 700. Likewise, in Strong, we held that the failure to adhere to the implied consent law and its related regulations did not render blood-test results inadmissible where blood was drawn *791 for an exclusively medical purpose.[8] This is true even though the blood or test results later are seized and used as evidence in a DUI-related prosecution. Strong, 504 So.2d at 760. Once again, however, the state is not entitled to rely on any of the presumptions created by the implied consent law, and thus must establish the three-prong predicate described in Bender.
Based on the policies elaborated above, we believe that one further exception to the exclusionary rule exists. We hold that the implied consent law does not absolutely forbid the admission into evidence of blood-alcohol test results and related testimony produced by an unlicensed expert, subject to two important provisos. First, the blood must have been drawn by a person authorized to do so by the implied consent statute.[9]See Gillman; § 316.1933(2)(a), Fla. Stat. (1987). And second, the evidence so produced cannot be admitted unless the state establishes the three-prong predicate described in Bender.
As a result, all presumptions created by the implied consent law do not apply[10] and the state will bear the burden of establishing that the expert was genuinely qualified to conduct and interpret the test,[11] among the other Bender requirements. If the state does not shoulder this burden, or if the defense rebuts the state's evidence in this regard, then the test results will be inadmissible. Moreover, once such testimony is admitted, the defense will be entitled to challenge its reliability, including attempting to impeach the expert for being unlicensed. In effect, the admissibility of such evidence will be determined as though the implied consent statute did not exist and the HRS regulations were of no legal force.[12]
We find this exception comports with the purposes underlying the implied consent law's exclusionary rule. First, this exception is consistent with the goal of producing scientifically reliable evidence, since the state will shoulder the burden of establishing such reliability before the evidence can be admitted. Second, the exception also will not threaten the health of the test subject, since the expert will merely be conducting tests on a sample of blood that otherwise has been drawn by qualified persons in compliance with the implied consent law.[13]
*792 Having reviewed the record of the proceedings below, we find that the trial court fully complied with the principles described above. The record reflects that Robertson's blood was drawn by a person authorized by the statute  a nurse. The trial court expressly noted that Dr. Duer's testimony was being used, not as that of a licensed blood-alcohol examiner, but as that of an expert in the field of chemistry. A proper predicate already had been laid during the Richardson hearing, where the trial court inquired fully into the reliability of the test, Dr. Duer's qualifications, and whether proper equipment was used. Dr. Duer later testified as to the meaning of the test results.
Defense counsel elicited testimony about the fact that Dr. Duer lacked an HRS license. During closing arguments, defense counsel repeatedly argued to jurors that Dr. Duer was not qualified to conduct the test for this reason. Jurors then correctly were instructed that they could disbelieve all or part of Dr. Duer's testimony if they found he was not genuinely expert in the field. Likewise, the court did not instruct the jury on any of the presumptions created by the implied consent law, which would have been error. While the jury was told that a blood-alcohol level of 0.10 percent or higher could be an element of the crime,[14] this instruction clearly was derived from the statutory elements of DUI manslaughter, § 316.193, Fla. Stat. (1987), not from the statute creating a presumption of impairment. § 316.1934, Fla. Stat. (1987).
Accordingly, we find no error in the admission of either Dr. Duer's testimony or his blood-alcohol test results, and no error in the other issues raised by Robertson.[15] The result reached by the court below is approved.
It is so ordered.
BARKETT, C.J., and McDONALD and HARDING, JJ., concur.
GRIMES, J., concurs with an opinion.
OVERTON, J., concurs in result only with an opinion, in which SHAW, J., concurs.
SHAW, J., concurs in result only with an opinion, in which OVERTON, J., concurs.
GRIMES, Justice, concurring.
At first blush, the majority opinion appears inconsistent to the extent that the blood was involuntarily withdrawn under the authority granted by the implied consent *793 law, yet the results of the blood test were allowed into evidence in spite of the noncompliance with the testing requirements of that law. However, because of the existence of probable cause, the blood could have been involuntarily withdrawn even in the absence of the implied consent law. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Thus, it is reasonable to conclude that noncompliance with certain aspects of the implied consent law does not totally preempt the ability to introduce blood test results without the benefit of the statutory presumption. On the other hand, it is imperative to protect the health of those involved. Therefore, the majority opinion properly construes the implied consent law to mean that test results of blood which is involuntarily taken cannot be introduced into evidence unless the blood is withdrawn by a statutorily qualified person.
OVERTON, Justice, concurring in result.
I fully agree with Justice Shaw. The statutory means is not the exclusive manner by which blood tests may be admitted into evidence in this state. As the United States Supreme Court held in Schmerber v. California, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966), if the blood test "was performed in a reasonable manner," such as where the "blood was taken by a physician in a hospital environment according to accepted medical practices," the test would be admissible under traditional common law rules. The blood test, however, would not have the benefit of the statutory presumptions unless it met the statutory requirements. In my view, the majority opinion does not change this principle.
SHAW, J., concurs.
SHAW, Justice, concurring in result.
I agree that because the person testing Robertson's blood did not possess the "valid permit issued by the department [of Health and Rehabilitative Services]," required by section 316.1934(3), Florida Statutes (1987), the presumption afforded in section 316.1934(2)(c), Florida Statutes (1987), is not available to the State in its prosecution of this case. This however is not dispositive of the question whether the test results are admissible under the common law.
As to this latter issue, I also agree with the majority that if the test is performed by other than one holding a valid HRS permit, then the result of the test is admissible under the common law if the traditional predicates exist: 1) the test is reliable; 2) the test was performed by a qualified person; and 3) the meaning of the test is explained to the jury by an expert. Bender, 382 So.2d at 700.
The majority opinion points to language in Bender that would appear to preclude admission of common law blood-test evidence[16] and offers an extended analysis to address this language. I do not believe this extended analysis is necessary for I read the language as dictum. Two questions were presented in Bender: whether the consent statutes[17] constituted an unlawful delegation of legislative power to the executive branch (specifically HRS and the Department of Highway Safety and Motor Vehicles (DHSMV)) and whether the failure of the HRS and DHSMV to incorporate into rules the manufacturers' procedures for maintaining and operating breathalyzers violated equal protection and due process. This Court determined that the statutes were constitutional. In reaching that conclusion we noted that there is no constitutional impediment to a blood-alcohol test with or without consent where probable cause has been established. Bender, 382 So.2d at 698. We also noted that the authority to test for blood alcohol existed without the statute. Id. at 700. I regard the comment "test results are admissible into evidence only upon compliance *794 with the statutory provisions"[18] as relating only to the benefit of the statutory presumption, and not determining the continued vitality of the common law, which was never at issue in Bender.
OVERTON, J., concurs.
NOTES
[1] If this had been the case, then the blood-alcohol evidence taken from the blood sample would have been admissible independently of the implied consent law, for the reasons expressed more fully below.
[2] The statute provides in pertinent part:

Notwithstanding any recognized ability to refuse to submit to the tests provided in s. 316.1932 or any recognized power to revoke the implied consent to such tests, if a law enforcement officer has probable cause to believe that a motor vehicle driven by or in the actual physical control of a person under the influence of alcoholic beverages or controlled substances has caused the death or serious bodily injury of a human being, such person shall submit, upon the request of a law enforcement officer, to a test of his blood for the purpose of determining the alcoholic content thereof... . The law enforcement officer may use reasonable force if necessary to require such person to submit to the administration of the blood test
§ 316.1933(1), Fla. Stat. (1987).
[3] The parties have not raised, and we do not address, the propriety of this procedure under the various provisions of article I of the Florida Constitution.
[4] The implied consent law consists of sections 316.1932, 316.1933, and 316.1934, Florida Statutes (1987), which essentially require all persons accepting a license to drive in Florida to consent to a blood-alcohol test upon being arrested for driving under the influence. State v. Strong, 504 So.2d 758, 759 (Fla. 1987). Prior to 1982, these sections were codified in sections 322.261 and 322.262, Florida Statutes (1981). Id. at 759 n. 2.
[5] As is noted more fully below, this exclusionary rule does not prohibit the use of all evidence obtained contrary to the implied consent law, but only such evidence obtained in a manner that is contrary to the core policies of that statute: ensuring scientific reliability of the tests, and protecting the health of test subjects. To this extent, the present opinion clarifies the holding of Bender.
[6] Of course, the defense still has the opportunity to rebut the presumption created by the statute. State v. Bender, 382 So.2d 697, 699 (Fla. 1980). For example, the defense might challenge the HRS regulations themselves as being scientifically unsound, but the burden would rest on the defense to prove this point. Other similar matters also can be challenged by the defense, as we noted in Bender. Id.
[7] In other words, the implied consent statute and its exclusionary rule apply only when blood is being taken from a person based on probable cause that the person has caused death or serious bodily injury as a result of a DUI offense specified in the statutes.
[8] Whether or not the defendant gave actual consent is not apparent from the Strong opinion. In any event, the issue is apparently irrelevant if the defendant was unconscious and in need of immediate emergency treatment. In such circumstances, consent would be implied on the independent basis of Florida's Medical Consent Law. § 766.103, Fla. Stat. (1989).
[9] This portion of the statute obviously is aimed at promoting the health of test subjects by ensuring that blood is drawn only by qualified persons. As applicable to the present case, this list consists of physicians, certified paramedics, registered nurses, licensed practical nurses, licensed clinical laboratory technicians, and licensed clinical laboratory technicians, and licensed clinical laboratory technologists. § 316.1933(2)(a), Fla. Stat. (1987). We recognize that the 1991 Legislature has changed the list to include other categories of health-care professionals. Ch. 91-255, §§ 2-3, Laws of Fla. (1991). However, these changes are not applicable to the present case.
[10] This includes the presumption that the test is reliable if conducted according to HRS regulations and the presumptions of impairment created by section 316.1934.
[11] In considering this question, the trial court must consider (among other reasons) why the expert is not licensed. If the lack of the license is due to a lack of qualifications, then the evidence obviously is inadmissible.
[12] We do not imply that the HRS regulations cannot be consulted. Adherence to the HRS regulations may be relevant to the question of reliability, since these regulations can be viewed as a recognized standard for conducting blood-alcohol testing. However, adherence to this standard will not create a presumption of reliability that the defense must rebut. In cases of this type, the state shoulders the entire burden.
[13] For these same reasons, we agree with the opinion in State v. Quartararo, 522 So.2d 42 (Fla. 2d DCA 1988), review denied, 531 So.2d 1354 (Fla. 1988). The Quartararo court held that evidence was admissible from a blood-alcohol sample taken by a paramedic who was not giving medical treatment to the test subject. The defense objected on grounds that the statute expressly authorizes paramedics to take blood only if they are "present at the scene of an accident for the purpose of rendering emergency medical service or treatment." Id. We do not believe that paramedics present at the scene for other purposes thereby become unqualified to draw blood, nor do they undermine the reliability of the test results later obtained. To this extent, Quartararo is in harmony with the views expressed in this opinion and in Bender. However, for the reasons expressed more fully in the body of the opinion, we disapprove Quartararo's suggestion that the implied consent law does not include an exclusionary rule. Quartararo, 522 So.2d at 44. To the extent the statute promotes reliability of test results and the health of test subjects, an exclusionary rule clearly exists. Bender, 382 So.2d at 699. Finally, we emphasize that test results are inadmissible under this exclusionary rule if blood is not drawn by a person expressly authorized in the implied consent statute. We also note that the legislature subsequently has amended the statute to delete the clause requiring a paramedic to be at the scene for the purpose of rendering emergency medical service or treatment. Ch. 88-5, Laws of Fla. Thus, if the facts of Quartararo arose today, the implied consent law would be fully applicable. To this extent, Quartararo has been legislatively abrogated. In addition, effective May 31, 1991, the list of authorized persons was changed to include other categories of health-care professionals. Ch. 91-255, Laws of Fla.
[14] Florida law authorizes two alternative theories for DUI offenses: actual impairment, or a blood alcohol level of 0.10 or higher. § 316.193, Fla. Stat. (1987). The second of these is a strict-liability theory, since the fact of operating a motor vehicle with a blood-alcohol level of 0.10 or higher is an offense even if impairment cannot be proven. There is some redundancy in the statute, however, since impairment is presumed if the blood-alcohol content is 0.10 or higher. § 316.1934(2), Fla. Stat. (1987). In any event, the presumption of impairment created by this last statute is a moot concern if the state proves beyond a reasonable doubt that the defendant operated a motor vehicle with an unlawful blood-alcohol level. Here, the state met this burden.
[15] These issues are that the evidence against Robertson was legally insufficient to support conviction; that the alleged Richardson violation substantially prejudiced the defense; and that the trial court improperly admitted statements made by Robertson to officers during the traffic-accident investigation. Each of these issues is without merit.
[16] "The test results are admissible into evidence only upon compliance with the statutory provisions... ." State v. Bender, 382 So.2d 697, 699 (Fla. 1980).
[17] §§ 322.261, 322.262, Fla. Stat. (1977). These provisions were the predecessors to the provisions at issue now.
[18] Bender, 382 So.2d at 699.