775 So.2d 950 (2000)
STATE of Florida, Petitioner,
v.
Michael Randy MILES, Respondent.
No. SC95490.
Supreme Court of Florida.
November 30, 2000.
*951 Robert A. Butterworth, Attorney General, James W. Rogers, Tallahassee Bureau Chief, Criminal Appeals, and Stephen R. White, Assistant Attorney General, Tallahassee, Florida, for Petitioner.
Barry W. Beroset and Ross A. Keene of Beroset & Keene, Pensacola, Florida, for Respondent.
PER CURIAM.
We have for review State v. Miles, 732 So.2d 350 (Fla. 1st DCA 1999), wherein the court certified the following question to be of great public importance:
WHERE THE STATE LAYS THE THREE-PRONGED PREDICATE FOR ADMISSIBILITY OF BLOOD-ALCOHOL TEST RESULTS IN ACCORDANCE WITH THE ANALYSIS SET FORTH IN ROBERTSON V. STATE, 604 So.2d 783 (Fla.1992), THEREBY ESTABLISHING THE SCIENTIFIC RELIABILITY OF THE BLOOD-ALCOHOL TEST RESULTS, IS THE STATE ENTITLED TO THE LEGISLATIVELY CREATED PRESUMPTIONS OF IMPAIRMENT?
Id. at 353. We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution. For the reasons stated below, we answer the certified question in the negative.

PROCEEDINGS TO DATE
Miles was involved in an automobile accident which resulted in the death of a passenger of another vehicle. Without Miles' consent, the law enforcement officers at the scene required him to submit to a blood draw pursuant to section 316.1933, Florida Statutes (1995). He was charged with driving under the influence of alcohol/manslaughter (DUI/manslaughter), vehicular homicide, DUI causing personal injury, and DUI causing property damage. Miles filed a motion to suppress or in the alternative a motion in limine to exclude the blood alcohol test results based on the alleged insufficiency of the Florida Department of Law Enforcement (FDLE) regulations governing the testing of his blood sample. Miles claimed that rule 11D-8.012 of the Florida Administrative Code did not adequately provide for the proper preservation of blood samples drawn pursuant to the implied consent law.
On August 20 and 26, 1997, the trial court held hearings on the issue of the inadequacy of rule 11D-8.012 as it relates to preservation of samples. During the hearings it was established without dispute that the blood alcohol content of a blood sample may be affected by the sample's exposure to heat or by the presence of certain bacteria in the sample. Thus, the evidence presented established that a sample should be kept refrigerated. An FDLE expert testified that it was not necessary to provide guidelines on this issue because handling procedures were universally known and followed. However, a defense expert disagreed, and pointed out that the present rule fails to provide for proper preservation, does not even require the use of a preservative, and simply mentions the need for an anticoagulant without specifying the necessary amount. The court denied the motion to suppress, but ruled that because of the statute's failure to provide for preservation and the deficiency of the rule in protecting the integrity of the process, the State would not be entitled to the presumption of impairment provided for pursuant to section 316.1934(2)(c), Florida Statutes (1995).[1]
*952 The court recognized that section 316.1933(2)(b), Florida Statutes (1995), authorizes that the FDLE approve "satisfactory techniques or methods, ascertain the qualifications and competence of individuals to conduct such analyses, and issue permits that are subject to termination or revocation at the discretion of the department." The court noted that the statute provides that testing of blood samples must be done according to methods approved by the FDLE and by an individual possessing the necessary permit. However, the court found the FDLE rule fails to provide for the collection, storage, or transportation of samples drawn pursuant to the statute. In its ruling, the trial court focused on the undisputed importance of the process of maintaining the sample in the condition necessary to ensure a reliable analysis and reading of the blood alcohol content of a sample. Given that the preservation, storage, and transit of a sample between the draw date and the date of analysis is critical to establishing a reliable analysis, the court concluded that the rule does not comply with the core policies of the statute as stated in State v. Bender, 382 So.2d 697 (Fla.1980).
On appeal, the First District affirmed the trial court's decision regarding the inadequacy of the rule to provide for the preservation of the sample. See Miles, 732 So.2d at 353. However, the First District held that the legislatively created presumptions will be applicable upon admissibility of the sample according to the dictates of Robertson, and thus certified the aforementioned question. See id.

THE IMPLIED CONSENT LAW
To address the problem of drunk driving on Florida roads, the Legislature enacted what is known as the implied consent law. See §§ 316.1932, 316.1933, 316.1934, Fla. Stat. (1995). The implied consent law provides, inter alia, that one who operates a motor vehicle in the State of Florida is deemed to have consented to submit to the appropriate test to determine blood alcohol content, upon his or her arrest for an offense allegedly committed while driving under the influence of alcohol or a prohibited substance. See id. Furthermore, under the statutory scheme for driving under the influence, the State is entitled to certain presumptions of impairment upon the establishment of a given alcoholic blood content of the defendant. See § 316.1934(2), Fla. Stat. (1995).[2] The Legislature delegated to the FDLE the task of formulating and approving the process in which a person's blood is analyzed in determining its alcoholic content. Hence, section 316.1933(2)(b), Florida Statutes, provides:
A chemical analysis of the person's blood to determine the alcoholic content *953 thereof must have been performed substantially in accordance with methods approved by the Department of Law Enforcement and by an individual possessing a valid permit issued by the department for this purpose. The Department of Law Enforcement may approve satisfactory techniques or methods, ascertain the qualifications and competence of individuals to conduct such analyses, and issue permits that are subject to termination or revocation at the discretion of the department. Any insubstantial differences between approved methods or techniques and actual testing procedures, or any insubstantial defects concerning the permit issued by the department, in any individual case, shall not render the test or test results invalid.
Id.; cf. § 316.1932(1)(b)(2), Fla. Stat. (1995) (applicable for breath analysis).

BENDER
The constitutionality of the implied consent law and the associated presumptions were comprehensively addressed by this Court in State v. Bender, 382 So.2d 697 (Fla.1980). In Bender, four defendants who were issued traffic citations filed motions challenging the constitutionality of the implied consent law and seeking to suppress the results of blood tests. See id. at 698. The trial court agreed and ruled that the delegation of authority by the Legislature to the responsible state agencies, the Department of Health and Rehabilitative Services (HRS) and the Department of Highway Safety and Motor Vehicles (DHSMV), was unconstitutional in that it did not provide sufficient guidelines and standards. See id. Additionally, the trial court ruled the defendants' due process and equal protection rights were violated because the agencies failed to "incorporate the procedures and methods of the manufacturers [of the testing equipment] for the maintenance and operation of the breathalyzers." Id.
However, upon review, this Court found the pertinent sections of the implied consent law delegating the approval of testing methods to executive agencies to be constitutional. See id. We held that the failure of the administrative agency to attach to the rule and file with the Secretary of State the manufacturers' procedures for maintenance and operation did not violate due process where the rules were in fact in accordance with the manufacturers' procedures. See Bender, 382 So.2d at 700. Although we found the delegation of authority to enact rules constitutional, we did not address the adequacy of the administrative rules in Bender. Nevertheless, we noted the underlying purpose of the implied consent law:
The purpose of those portions of sections 322.261 and 322.262[[3]] which direct law enforcement to use only approved techniques and methods is to ensure reliable scientific evidence for use in future court proceedings and to protect the health of those persons being tested, who by this statute have given their implied consent to these tests.
Id. at 699 (emphasis added). We concluded that compliance with the statutory mandate for reliable procedures and administrative rules is essential. See id. Accordingly, we held that "[n]one of the statutory presumptions can apply in the absence of compliance with the administrative rules." Id. at 700. In essence, we held that there was a clear trade-off in conditioning the grant of presumptions on the integrity of the testing process.

ADEQUACY OF RULE 11D-8.012
Initially, we conclude that the First District did not err in approving the finding of the trial court that rule 11D-8.012 does not comply with Bender and therefore may not give rise to the statutory *954 presumptions associated with the implied consent law.[4] Pursuant to the legislative mandate of the implied consent law, the FDLE has promulgated a set of rules relating to testing methods, procedures, and issuance of permits to blood alcohol analysts. With regard to the labeling and sampling of blood samples, the FDLE rule provides:
(1) All blood sample vials or tubes shall be labeled with the following information:
(a) Name of person tested;
(b) Date and time sample collected;
(c) Initials of personnel collecting the sample.
(2) Cleansing of the person's skin in collecting of the blood sample shall be performed with a non-alcoholic antiseptic solution.
(3) Blood samples shall be collected in a vial or tube containing an anticoagulant substance. Said vial or tube shall be stoppered or capped to prevent loss by evaporation.
Fla. Admin. Code Ann. R. 11D-8.012. There is no provision in this rule for preservation of the sample pending testing.
As earlier stated, the trial court held hearings before ruling on the adequacy of rule 11D-8.012. Both the State and the defense presented experts as to the need for standards and quality controls in drawing, maintenance, and testing of blood samples. Though the testimonies differ in some respects, the consensus was that indeed the proper preservation of a blood sample was fundamental to any quality control scheme. Indeed, the State's experts testified that the requirement was so fundamental that it did not need to be in a rule because anyone dealing with blood samples would be aware of the need for proper preservation. The experts agreed that exposure of a blood sample to a certain level of heat or bacteria over time may impact its alcoholic content. One defense expert testified that as a general matter some form of anticoagulant, preservative, and refrigeration are essential to preserve the integrity of the blood. The purpose of the anticoagulant is to prevent the blood from clotting, which, as further explained by one expert, may give a "false high alcohol" reading. The purpose of the preservative is two-fold. First, it actually prevents the destruction of blood alcohol incident to chemical oxidation and buildup of microorganisms. Second, a preservative serves to prevent certain microorganisms from turning sugars in the blood into alcohol. As such, the absence of preservative may lead to either an increase or decrease of blood alcoholic concentration depending on the circumstances, namely the presence of sugar in the blood.[5]
*955 Based on the evidence presented by both defense and State experts as to the fundamental importance of proper preservation of blood samples, we find no error in the First District's approval of the trial court's finding.[6]
Without provisions for proper maintenance of a blood sample, the integrity of the sample is guaranteed only from the point of testing, regardless of the length of time that passes before the FDLE actually performs the testing. In the instant case, we note the testing did not occur until some fourteen days after the blood draw. Under the evidence presented in the trial court, fourteen days without refrigeration may well have impacted the integrity of the blood sample. Hence, as found by the trial court, the absence of maintenance standards renders rule 11D-8.012(3) inadequate and inconsistent with the purpose of the implied consent law as it relates to ensuring the reliability of test results. As such, the State is not entitled to the presumptions of impairment associated with the implied consent statutory scheme.

ROBERTSON
Moving on to the certified question, it essentially asks whether, in the absence of compliance with the implied consent statute, the State can still get the benefit of the presumptions by alternatively going through the three-prong predicate of Robertson v. State, 604 So.2d 783 (Fla.1992). It should be noted that we have explicitly answered this question in the negative in both Bender and Robertson, and held that the presumptions of impairment are specifically contingent upon compliance with the implied consent law.
Robertson involved a DUI/manslaughter prosecution where the blood test was performed by an individual, Dr. Duer, not certified by HRS. See id. at 787. Robertson objected to the admission of the test results on the ground that Dr. Duer's uncertified status when he performed the test violated the implied consent law. See id. In response to Robertson's objection to the test results, the State argued that Dr. Duer's work was supervised by a certified doctor, and therefore the statute was satisfied. Upon additional testimony from *956 Dr. Duer about his extensive credentials and the procedures he followed in conducting the test, the trial court admitted the test results. See id. at 787-88. The Fifth District affirmed and certified the following question:
Can the state introduce into evidence test results of blood samples taken at the request of law enforcement if the requirements of section 316.1933 are not satisfied? If so, upon proof of qualification of the person taking blood or conducting the test, can the state nonetheless rely on the provisions of section 316.1933 to prove a violation of section 316.193[[7]] or must the state introduce competent proof wholly independent of the statute?
Id. at 786.[8] At the outset, we found that Dr. Duer's performance of the test without being certified violated the implied consent law. See id. at 788. Nonetheless, the Court approved the result reached by the Fifth District and held:
[T]he implied consent law does not absolutely forbid the admission into evidence of blood-alcohol test results and related testimony produced by an unlicensed expert, subject to two important provisos. First, the blood must have been drawn by a person authorized to do so by the implied consent statute. And second, the evidence so produced cannot be admitted unless the state establishes the three-prong predicate described in Bender.

As a result, all presumptions created by the implied consent law do not apply and the state will bear the burden of establishing that the expert was genuinely qualified to conduct and interpret the test, among the other Bender requirements. If the state does not shoulder this burden, or if the defense rebuts the state's evidence in this regard, then the test results will be inadmissible. Moreover, once such testimony is admitted, the defense will be entitled to challenge its reliability, including attempting to impeach the expert for being unlicensed. In effect, the admissibility of such evidence will be determined as though the implied consent statute did not exist and the HRS regulations were of no legal force.
Robertson, 604 So.2d at 791 (footnotes and citations omitted) (emphasis added).
As found in Bender and later explained in Robertson, prior to the implied consent law, the following three-prong predicate had to be established in order to admit test results: (1) the test was reliable, (2) the test was performed by a qualified operator with the proper equipment, and (3) expert testimony was presented concerning the meaning of the test. See Robertson, 604 So.2d at 789 (citing Bender, 382 So.2d at 699). That process was somewhat cumbersome to trial judges who had to determine the admissibility of the results after listening to arguments and testimony often mired in complicated scientific language. See id. The implied consent law addressed that situation by providing for the presumption of correctness of test results so long as the state complies with the relevant statute and rules, thereby satisfying the purpose of the statute in ensuring reliability of the tests and the safety of tested individuals. See id.
As illustrated in Robertson, however, compliance with the implied consent law is not always assured. Robertson thus stands for the rule that, in such instances, the State must revert back to the common law approach through the two provisos *957 mentioned above.[9] It is important to note that, as underlined above, we made it clear that the statutory presumptions would not be applicable in such instances. That was also evident in our emphasis in Robertson that it would have been error for the trial court to have instructed the jury on any of the presumptions of the implied consent law once the State had to revert to the common law approach. See id. at 792. Moreover, it is apparent that the State's obligation for quality assurance under the implied consent law would be pursued less vigorously if the State could avail itself of the presumptions of the implied consent law even when the statutory mandate for quality assurance under the implied consent statutory scheme is not enforced.

CONCLUSION
We answer the certified question in the negative. As shown in Robertson, the common law approach (the three-prong predicate) and the presumptions are mutually exclusive to the extent that the presumptions are specifically contingent upon compliance with the mandate for quality assurance of the implied consent law. Accordingly, we quash the decision of the First District in part and approve it in part, and remand for proceedings consistent with this opinion.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE and QUINCE, JJ., concur.
WELLS, C.J., dissents with an opinion, in which LEWIS, J., concurs.
WELLS, C.J., dissenting.
I would adopt the views of Judge Wolf in the district court's decision in this case.
LEWIS, J., concurs.
NOTES
[1] Instead, the court ruled that the State would be permitted to present the results of its testing of the blood sample and the parties would be allowed to establish the circumstances surrounding the preservation, storage, and transportation of samples drawn according to Robertson v. State, 604 So.2d 783 (Fla.1992). The fact-finder would then resolve the contested issues.
[2] The statute provides:

(2) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving, or in actual physical control of, a vehicle while under the influence of alcoholic beverages or controlled substances, when affected to the extent that the person's normal faculties were impaired or to the extent that he or she was deprived of full possession of his or her normal faculties, the results of any test administered in accordance with s. 316.1932 or s. 316.1933 and this section are admissible into evidence when otherwise admissible, and the amount of alcohol in the person's blood or breath at the time alleged, as shown by chemical analysis of the person's blood, or by chemical or physical test of the person's breath, gives rise to the following presumptions:
. . . .
(c) If there was at that time 0.08 percent or more by weight of alcohol in the person's blood or breath, that fact shall be prima facie evidence that the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired. Moreover, such person who has a blood or breath alcohol level of 0.08 percent or above is guilty of driving, or being in actual physical control of, a motor vehicle, with an unlawful blood or breath alcohol level.
Id.
[3] At the time we issued Bender, the implied consent statutory scheme was provided for under chapter 322, Florida Statutes (1977).
[4] Note that this case is different from many others in that the adequacy of the rule itself was challenged at trial, as opposed to the noncompliance with a rule. See, e.g., Albritton v. State, 561 So.2d 19, 20 (Fla. 5th DCA 1990) ("The state failed to prove that at the time the blood was withdrawn in this case, the technologist was in fact licensed."); Donaldson v. State, 561 So.2d 648, 650 (Fla. 4th DCA 1990) ("For the state to totally omit evidence concerning half of the approved testing process cannot be substantial compliance.").
[5] The defense expert ultimately concluded that in order to maintain the integrity of a sample, the anticoagulant and preservative should be used, and the sample should be kept as refrigerated as possible before testing. The State experts, in their testimony, reiterated the vulnerability of a sample when left unrefrigerated and without preservatives. One of them explained, however, that refrigeration is just one method to be used inasmuch as the integrity of the blood can alternatively be maintained through a preservative. However, the other testified that though the presence of microorganisms along with other circumstances may in fact increase the alcoholic concentration in a blood sample, that possibility is remote in a case of a living person who is not critically ill. Importantly though, when asked as to the exact impact of heat on blood alcohol reading, one of the State experts responded that while it would most probably lead to a lower result, such a result "is not necessarily guaranteed."
[6] It should be pointed out that, as it relates to the preservation of a blood sample prior to testing, some jurisdictions have explicitly recognized the need to provide more specific guidelines. For instance, Ohio Admin. Code § 3701-53-05 provides in part:

(E) Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:
(1) Name of suspect;
(2) Date and time of collection;
(3) Name or initials of person collecting and/or sealing sample.
(F) While not in transit or under examination, all urine and blood specimens shall be refrigerated.
Id. (emphasis added); see also § 77 Ill. Admin. Code 510.110(a)(4)(C)(ii) (1999) ("[i]dentity and integrity of the sample shall be maintained through collection to analysis and reporting."). Applying this rule, Ohio courts have suppressed test results where the prosecution failed to establish the refrigeration of a sample before testing. See State v. Smith, 82 Ohio Misc.2d 16, 676 N.E.2d 192 (Ohio Mun.Ct.1996). In Smith, the laboratory received a urine sample at 9:30 a.m. on Tuesday, May 21, 1996, and tested the sample at 8:30 a.m. on May 22, 1996. See id. at 194. However, the court suppressed the test results due to the fact that the property-control log contained no information as to whether and when the sample was refrigerated and by whom the sample was placed in the refrigerator prior to testing. See id.; see also City of Mason v. Murphy, 123 Ohio App.3d 592, 704 N.E.2d 1260, 1262 (1997) ("Substantial compliance with Ohio Adm.Code 3701-53-05(F) cannot be shown when no evidence is presented concerning the refrigeration temperature when the [blood] sample was stored for approximately one week.").
The Ohio precedent is admittedly not perfectly applicable here for one reason. In contrast to the instant case, the administrative rule there provided for the preservation of the blood and urine samples from collection to testing, and therefore the analysis focused on whether the State substantially complied with the stated rules. Nevertheless, these cases underscore the necessity to provide for specific written guidelines with regard to the refrigeration of samples from collection through analysis.
[7] This section simply defines the offense of driving under the influence and the various penalties associated therewith.
[8] The Fifth District actually certified two questions. The other question, which the Court answered negatively, stated:

May a chemical analysis performed in accordance with the approved methods contemplated by section 316.1933 be conducted under the supervision of a permittee by individuals not possessing [a Florida Department of Health and Rehabilitative Services ("HRS") ] permit?
See Robertson, 604 So.2d at 786 (alteration in original).
[9] Robertson, 604 So.2d at 791 ("First, the blood must have been drawn by a person authorized to do so by the implied consent statute. And second, the evidence so produced cannot be admitted unless the State establishes the three-prong predicate described in Bender.")