805 So.2d 990 (2001)
Gregory S. DODGE, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-1266.
District Court of Appeal of Florida, Fourth District.
December 6, 2001.
Rehearing Denied February 11, 2002.
*991 Jack A. Fleischman of Fleischman & Fleischman, P.A., Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Bart Schneider, Assistant Attorney General, West Palm Beach, for appellee.

ON MOTION FOR REHEARING, REHEARING EN BANC, CERTIFICATION OF QUESTION OF GREAT PUBLIC IMPORTANCE, CERTIFICATION OF CONFLICT
SHAHOOD, J.
We grant appellee's motion for rehearing, withdraw our prior opinion, and substitute the following in its place.
Following a jury trial, appellant was convicted of DUI manslaughter, DUI with serious bodily injury to another, and two counts of driving under the influence resulting in property damage. He appeals the trial court's denial of his motion in limine to exclude the results of blood tests. After reconsideration, we hold that the results of appellant's blood tests were properly admitted, and affirm his convictions.
*992 The charges against appellant resulted from an accident in which his vehicle drifted over the center line on the Florida Turnpike into the vehicle occupied by the Bell family. Two of the passengers in the Bells' vehicle were injured; a third was killed.
Prior to trial, appellant filed a motion in limine to exclude the blood and the results of the analysis performed on the blood which was extracted from him at the hospital. He argued that the process by which the blood was drawn and preserved was not scientifically reliable and compromised the reliability of the results obtained.
At the hearing on the motion in limine, F. Thomas Carroll (Carroll), a forensic toxicologist at the Palm Beach County Sheriff's Office's crime laboratory, discussed the effects of having an anti-coagulant mixed in with the blood sample, and explained that the only way the anti-coagulant could affect the reliability of the testing is if there is none at all in the vial. On cross-examination, Carroll admitted that he was not at the hospital when the blood was drawn and had no way of knowing the reliability of the test. He assumed an anti-coagulant had been introduced into the samples of appellant's blood because it was not clotted. The court denied the motion in limine stating only that "the record speaks for itself."
Prior to trial, defense counsel also objected to a late witness being added to the state's list. The state sought to have the nurse's supervisor, Mary Nevels (Nevels), testify that the nurse who drew appellant's blood was certified to draw the blood, and also to verify the nurse's signature on the Implied Consent form. The form had been filled out by the state trooper and signed by the nurse when he drew appellant's blood. Defense counsel argued that because Nevels was not the person who had drawn appellant's blood, she was an improper person through whom to introduce the blood test results. The court denied the request to exclude the supervisor's testimony.
At trial, trooper Kelly Hildreth Bagnardi (Bagnardi), a traffic homicide investigator with the Florida Highway Patrol, testified that she met appellant's ambulance at the hospital and requested that a nurse draw his blood. Bagnardi identified the blood kit which she had taken to the hospital and which was ultimately used to draw appellant's blood. She stated that it is her practice to initial the stickers which go on the vials of blood, and to have the nurse or paramedic who actually draws the blood place his or her initials on the package as well. Bagnardi observed appellant's blood being drawn that night and then took the vials of his blood and initialed the stickers. She had the nurse, Donald Cook (Cook), initial the stickers as well and then placed the vials in a bag and sealed the bag. Bagnardi delivered the bag to Corporal Ratliff who was at the scene of the accident.
Nevels testified that Cook is authorized to draw blood and that, over the past ten years of supervising him, Nevels has seen his signature many times. She then identified Cook's signature on the Implied Consent form and verified his initials on the labels affixed to the vials of blood. Nevels admitted that she was not present when the blood was drawn, and could not testify as to the procedures which were followed in drawing appellant's blood, or the reliability of the samples.
Over defense objections, the forensic toxicologist, Carroll, testified at trial that he received a sealed bag containing the vials of appellant's blood and tested the samples to determine the blood alcohol level. He stated that none of the substances which were put into the blood for *993 testing would affect the blood alcohol level. Carroll testified as to the method he used to test the blood samples and stated that he calibrated the gas chromatograph machine and insured it was functioning properly before performing the tests.
Carroll testified that the blood alcohol level in appellant's blood was 0.09. He explained the physiological process by which a human body absorbs alcohol into the bloodstream, as well as the various blood alcohol levels at which a person's brain becomes affected. He told the jury that, at a level of 0.09, an individual's eyesight would be impaired and his motor skills might be affected. Considering the rate that alcohol is eliminated from the body, Carroll opined that appellant's blood alcohol level at the time of the accident was probably 0.12, and that appellant probably consumed at least eight beers. According to Carroll, a person with such a blood alcohol level would have a loss of mental acuity, a decrease in good judgment, and a decrease in distance perception, but no noticeable intoxication or loss of motor skills.
Appellant raises two issues on appeal, both of which challenge the admissibility of the blood test results. First, he argues that it was error to admit the blood test results and to instruct the jury on the presumption of impairment because the state did not prove the scientific reliability of the tests. Second, he argues that Nevels was an improper party through whom to introduce the test results. We affirm as to both issues.
Addressing the second issue first, we hold that it was not error to admit the blood tests into evidence through the testimony of Nevels. Her testimony was proper to show that the chain of custody of the blood samples was preserved. Bagnardi testified that she witnessed Cook draw appellant's blood, put it into the vials, seal the vials, and place his initials on the labels affixed to the vials. Nevels confirmed that Cook was qualified to draw the blood, and also identified his initials. Carroll then testified that he received the vials with the seals intact. Carroll also explained the testing procedures and interpreted the results. Based on the testimony of these three witnesses, the blood tests were properly admitted into evidence. See generally Jordan v. State, 707 So.2d 816 (Fla. 5th DCA), approved, 720 So.2d 1077 (Fla.1998)(holding that, in DUI manslaughter case, chain of custody evidence established no probability that the sample had been tampered with; therefore, results of blood test taken at hospital were properly admitted); see also Robertson v. State, 604 So.2d 783 (Fla.1992)(establishing three-prong predicate for admitting scientific evidence).
We also find no error with regard to the jury instruction in this case. The law in this state provides that anyone who operates a motor vehicle is deemed to have consented to submit to appropriate testing to determine his blood alcohol content. See §§ 316.1932, 316.1933, Fla. Stat. (2000)(the Implied Consent Statute). The results of those tests are admissible into evidence and give rise to the presumption that (1) the person was not under the influence of alcohol if the blood alcohol level is less than 0.05, or (2) the person was under the influence of alcohol if the blood alcohol level is greater than 0.08. See § 316.1934(2)(a),(c), Fla. Stat. (2000). If the blood alcohol level is between 0.05 and 0.08, no presumption of impairment arises, but the test may be considered along with other competent evidence to determine the level of the defendant's impairment at the time of the accident. See § 316.1934(2)(b), Fla. Stat. (2000).
The legislature delegated to the Florida Department of Law Enforcement *994 (FDLE) the task of formulating and approving the process by which a person's blood is analyzed. See § 316.1933(2)(b), Fla. Stat. (2000). Compliance with the administrative rules is essential because the presumption of impairment is entirely contingent on the integrity of the process. See State v. Bender, 382 So.2d 697, 699-700 (Fla.1980), limited by, Robertson v. State, 604 So.2d 783 (Fla.1992).
The issue of the adequacy of the FDLE's rules and procedures was considered in State v. Miles 732 So.2d 350 (Fla. 1st DCA 1999)(Miles I), approved in part and quashed in part, 775 So.2d 950 (Fla. 2000)(Miles II). In Miles I, the first district held that the FDLE rules were inadequate because they failed to ensure reliable testing and analysis of blood samples. 732 So.2d at 353. In Miles II, the supreme court agreed, and held further, that the state would not be entitled to a jury instruction on the statutory presumption of impairment, even if the evidence of blood alcohol level was admitted according to the three-prong predicate of Robertson.[1]See Miles II, 775 So.2d at 953-54. The supreme court held that "the common law approach (the three-prong predicate) and the presumptions are mutually exclusive to the extent that the presumptions are specifically contingent upon compliance with the mandate for quality assurance of the implied consent law." Id.
In this case, the evidence of appellant's blood alcohol level was properly admitted in accordance with the three-prong test enunciated in Robertson, and not in accordance with the Implied Consent Law. Appellant nevertheless argues, that even though the blood alcohol evidence was not admitted in compliance with the Implied Consent Law, the state had the benefit of the jury instruction on the presumption of impairment.
The trial court instructed the jury as follows:
Before you can find the defendant guilty of DUI, the State must prove the following two elements beyond a reasonable doubt:
First, Gregory S. Dodge ... drove or was in actual physical control of a vehicle.
Second, while driving or in actual physical control of the vehicle, Gregory S. Dodge was under the influence of alcoholic beverages to the extent his normal faculties were impaired, or had a blood alcohol level of point-of 0.08 or higher.
Upon reconsideration, we hold that it was not error to give the above instruction in this case. We agree with the analysis of the second district in Tyner v. State, 805 So.2d 862 (Fla. 2d DCA 2001). In Tyner, the court aptly pointed out that, based on a strict liability theory, one who operates a motor vehicle with a blood-alcohol level of 0.10 or higher is guilty of a DUI offense even if impairment cannot be proven. See id. (citing Robertson, 604 So.2d at 792 n. 14). Thus, "the presumption of impairment created by [section 316.1934(2), Florida Statutes] is a moot concern if the state proves beyond a reasonable doubt that the defendant operated a motor vehicle with an unlawful blood-alcohol level." Id. (quoting Robertson, 604 So.2d at 792 n. 14).
In this case, there was evidence that the level of alcohol in appellant's blood at the *995 time it was tested was 0.09. Moreover, there was expert testimony that appellant's blood alcohol level at the time of the accident was 0.12. Thus, it was proper to instruct the jury that if it found that appellant's blood alcohol level was greater than 0.08 at the time he drove his automobile into the Bells' vehicle, then the jury must also find that appellant was guilty of the offense of DUI.
AFFIRMED.
DELL and GUNTHER, JJ., concur.
NOTES
[1] In Robertson, it was held that in order to admit test results, it must be established that (1) the test was reliable, (2) the test was performed by a qualified operator with the proper equipment, and (3) expert testimony was presented concerning the meaning of the test. 604 So.2d at 789 (citing Bender, 382 So.2d at 699).