799 So.2d 243 (2001)
Cornelius G. RAFFERTY, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 2D00-462.
District Court of Appeal of Florida, Second District.
August 1, 2001.
Rehearing Denied October 4, 2001.
*244 James Marion Moorman, Public Defender, and Dea Abramschmitt, Special Assistant Public Defender (withdrew after briefing), and Robert D. Rosen (substituted as counsel of record), Assistant Public Defender, Bartow, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General, Tallahassee, and Susan D. Dunlevy, Assistant Attorney General, Tampa, for Appellee/Cross-Appellant.
PARKER, Acting Chief Judge.
Cornelius G. Rafferty appeals his judgments and sentences for DUI manslaughter and DUI serious bodily injury. We find merit in two of the issues Rafferty raises and conclude that the trial court erred in (1) denying Rafferty's motion to suppress his statements to law enforcement officers, and (2) granting the State statutory presumptions of admissibility of the blood alcohol test results and impairment. The resolution of these two issues renders the State's cross-appeal of Rafferty's downward departure sentence moot.
On August 5, 1997, Rafferty was driving a sports utility vehicle on Interstate 75 in Lee County. He lost control of the vehicle, and it overturned killing his six-yearold son and leaving his fiancée, who was also the mother of his children, a paraplegic. Rafferty's older son survived the accident. Paramedics, police, and the fire department arrived on the scene beginning at about 7:30 p.m. Rafferty was taken to the hospital and treated for a broken clavicle, a compression fracture of his spine, and lacerations requiring stitches to his face, head, and ear. Florida Highway Patrol (FHP) Trooper Manuel Smyrnios smelled the odor of alcohol coming from Rafferty and requested a blood draw some time between 9:25 p.m. and 11 p.m. At approximately 1 a.m., FHP Trooper James McPherson advised Rafferty of his Miranda[1] rights and conducted a taped interview of Rafferty in a hospital room with FHP Trooper Linda Ann Powell. Rafferty told the police that he had been driving about sixty or sixty-five miles per hour, that it was heavily raining, and that he was in the far right-hand lane just prior to the accident. He said that he drank about two, possibly three, beers that night.
The State subsequently charged Rafferty with DUI manslaughter and DUI serious bodily injury. Rafferty filed a motion to suppress challenging the admission of his taped statement to law enforcement officers and a motion to dismiss for speedy trial violation. The trial court denied the motions, and the case proceeded to a jury trial. Just prior to trial, Rafferty filed a motion in limine challenging the admissibility *245 of the blood alcohol test results. The trial court denied the motion, and defense counsel objected at trial to both the admission of the test results and the jury instruction regarding a presumption of impairment which flowed from the test results. The Florida Department of Law Enforcement (FDLE) crime laboratory analyst testified that the results of the blood alcohol test indicated that Rafferty had a blood alcohol level between .08 and .15 at the time of the accident. The blood alcohol level at the time of testing was .10. Rafferty's expert testified that Rafferty's blood alcohol level at the time of the accident was impossible to determine because the blood samples may have been exposed to heat for an extended time before testing. Both experts agreed that exposure to heat over time could cause the blood sugars to convert to alcohol and raise the level of blood alcohol in the samples.
The jury found Rafferty guilty as charged, and the trial court entered a downward departure sentence of sixty months' incarceration on each count, to run concurrently. Rafferty raises three issues on appeal: (1) the denial of Rafferty's motion to suppress; (2) the admissibility of the blood alcohol test results and the propriety of the jury instructions regarding the presumption of impairment; and (3) the denial of Rafferty's motion to dismiss for speedy trial violation. The State filed a cross-appeal challenging the downward departure sentence. We affirm the denial of Rafferty's motion to dismiss without discussion. However, we find merit in the other two issues Rafferty raises. Accordingly, we reverse and remand for a new trial.
In his motion to suppress, Rafferty argued that his statements should be suppressed because he unequivocally requested an attorney and the police did not stop the interrogation but continued questioning him. The taped statement begins with FHP Trooper McPherson advising Rafferty of his rights:
MCPHERSON [reading to Rafferty]: Knowing what my rights are, I hereby, prior to being interviewed, waive my rights to consult with a lawyer or to have him present during this interview. I do hereby affixaffix my signature accordingly.
Can you sign or do you just want me to go ahead and do you want to go ahead and
RAFFERTY: I need a lawyer.
MCPHERSON: You need to get a lawyer?
RAFFERTY: I guess, I don't know.
MCPHERSON: Okay.
RAFFERTY: I'll answer the questions.
POWELL: Do you want a lawyer?
MCPHERSON: Do you want a lawyer?
RAFFERTY: I'll answer the questions.
MCPHERSON: You gonna answer okay. You're gonna answer the questions here?
RAFFERTY: Yeah.
MCPHERSON: Okay. Can you sign here?
POWELL: Just scribble, it doesn't even have to be legible.
MCPHERSON: Yeah. Can you see that?
RAFFERTY: Where it says you have a right to an attorney?
MCPHERSON: Yeah.
RAFFERTY: I wantI want (inaudible).
MCPHERSON: You want an attorney?
RAFFERTY: Yeah.

*246 MCPHERSON: So you don't want to answer the questions.
RAFFERTY: I won't be answering the questions then.
POWELL: Do you want an attorney present now, this is what he's asking?
RAFFERTY: I don't think so.
MCPHERSON: Okay.
POWELL: So you do want to answer questions at this time?
RAFFERTY: Yeah.
MCPHERSON: You want to answer questions at this time?
RAFFERTY: Yeah.
It is well-settled that when a suspect makes an unequivocal request for an attorney during interrogation after he has waived his rights, all questioning must stop until an attorney is present. Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); State v. Owen, 696 So.2d 715 (Fla.1997). After he told the FHP trooper "I'll answer the questions," Rafferty made an unequivocal request for an attorney by answering yes when the trooper asked whether he wanted an attorney. Rafferty's subsequent statement "I won't be answering the questions then" clarified his intent to invoke his right to an attorney. There was nothing that needed to be further clarified, and the questioning should have ceased until an attorney was present. Thus, we reverse the trial court's denial of Rafferty's motion to suppress.
The second issue in this case involved the admissibility of the blood alcohol test results and the propriety of the jury instructions regarding the presumption of impairment as provided by the implied consent law. The implied consent law is embodied in sections 316.1932 to 316.1934, Florida Statutes (1997), and provides that anyone who drives a motor vehicle impliedly consents to be tested for blood alcohol content upon arrest for any offense committed while driving under the influence. The purpose of the implied consent law is to "ensure reliable scientific evidence for use in future court proceedings and to protect the health of those persons being tested, who by this statute have given their implied consent to these tests." State v. Bender, 382 So.2d 697, 699 (Fla.1980).
Section 316.1934, Florida Statutes (1997), contains express presumptions of impairment[2] and an implied presumption of admissibility of blood alcohol test results, both of which are contingent on compliance with Florida Administrative Code Rule 11D-8.012. Robertson v. State, 604 So.2d 783, 789 (Fla.1992). Rule 11D 8.012 provides:
Blood SamplesLabeling and Collection.
(1) All blood sample vials or tubes shall be labeled with the following information:
(a) Name of person tested;
(b) Date and time sample collected;
(c) Initials of personnel collecting the sample.
(2) Cleansing of the person's skin in collecting of the blood sample shall be performed with a non-alcoholic antiseptic solution.
(3) Blood samples shall be collected in a vial or tube containing an anticoagulant *247 substance. Said vial or tube shall be stoppered or capped to prevent loss by evaporation.
Notably absent from the rule is any provision regulating the preservation of blood samples.
After the trial in this case, the supreme court found rule 11D-8.012 "inadequate and inconsistent with the purpose of the implied consent law as it relates to ensuring the reliability of test results." State v. Miles, 775 So.2d 950, 955 (Fla.2000). The court held that the State is not entitled to the presumptions of impairment under section 316.1934 when the mandate for quality assurance under the implied consent law is not enforced, regardless of compliance with rule 11D-8.012. Id. at 957. The court reasoned that, "[w]ithout provisions for proper maintenance of a blood sample, the integrity of the sample is guaranteed only from the point of testing, regardless of the length of time that passes before the FDLE actually performs the testing." Id. at 955. The court found that the integrity of the blood sample in that case may have been compromised because the sample had been stored without refrigeration for fourteen days before it was tested.[3]Id. Because the storage conditions reflected noncompliance with the mandate for quality assurance under the implied consent law, the State was not entitled to the presumptions of impairment. Id.
The court concluded that, in the event of noncompliance with the implied consent law, the State would have to use the common law approach as set forth in Robertson to determine admissibility. Id. at 956. This common law approach required the State to prove that (1) the blood was drawn by a person authorized under the implied consent law, and (2) the three-part test as established in Bender was satisfied. Id. at 956-57 n. 9. Under the three-part test, the State must establish: (1) the test was reliable; (2) a qualified person conducted the test with the proper equipment; and (3) the meaning of the test as explained by expert testimony. Id. (citing Robertson, 604 So.2d at 789). The court also concluded that the statutory presumptions under the implied consent law and the common law approach were mutually exclusive, and that the State would not be entitled to the statutory presumptions in the event of noncompliance with the implied consent law, regardless of whether the common law approach was satisfied. Id. at 957.
In this case, as in Miles, the mandate for quality assurance under the implied consent law was not enforced. This case is a textbook example of how not to handle blood samples. The nurse took the blood samples from Rafferty between 9:25 p.m. and 11 p.m. on August 5, 1997. FHP Trooper Smyrnios then transported the blood samples to the FHP station. They were stored in a temporary storage facility from 1 a.m. to 1:30 p.m. on August 6, 1997. At 1:30 p.m. on that day, they were placed on a storage shelf in the evidence room instead of in the refrigerator. At 2:40 p.m., a FHP trooper picked up the blood samples for delivery to the FDLE in Fort Myers, although the trooper did not remember if the samples were transported in the air-conditioned area of his vehicle or in the trunk. At 3:30 p.m. on August 6, 1997, the FDLE in Fort Myers received the samples, which the FDLE crime laboratory analyst "assumed" had been refrigerated. The following day the FDLE in Fort Myers released the samples to Air-borne *248 Express for delivery to the FDLE in Tampa where the blood samples were to be tested. Although the samples were labeled "biohazard," they were not labeled perishable. The blood did not reach the FDLE in Tampa until August 13, 1997. There was no testimony as to where the blood samples were located for those six days or the conditions under which the blood samples were stored.
It is clear from the expert testimony that the integrity of the blood samples may have been compromised by the failure to ensure the samples were refrigerated for eight days before they were tested. Because the storage conditions reflect noncompliance with the implied consent law, the trial court erred in granting the State statutory presumptions of admissibility of the blood alcohol test results and impairment. Thus, we reverse and remand for further proceedings consistent with this opinion.
Although our reversal renders this issue moot, we note that the State was correct in its position on cross-appeal that the trial court erred in imposing a downward departure sentence. The trial court listed the following reasons in support of the downward departure sentence: (1) one of Rafferty's children had died; (2) the children's mother had been injured; and (3) the surviving child and his mother needed Rafferty's financial support. None of these reasons is listed in section 921.0026(2), Florida Statutes (1997), as a mitigating circumstance under which departure is reasonably justified. However, the statutory mitigating circumstances are not exclusive. State v. Amodeo, 750 So.2d 664, 665-66 (Fla. 5th DCA 1999).
Generally, mitigating circumstances supporting a downward departure ameliorate the level of the defendant's culpability. State v. D'Alexander, 496 So.2d 1007, 1008 (Fla. 2d DCA 1986). In evaluating a nonstatutory mitigating circumstance, the question the trial court should ask is whether the nonstatutory reasons for downward departure given meet the legislative policy for departing downward. State v. Chestnut, 718 So.2d 312, 313 (Fla. 5th DCA 1998). It cannot be said that the legislature intended lesser punishments when the victims of offenses are family members or loved ones. Similarly, the Fourth District has concluded that a finding that the defendant has "suffered enough" for his crime because of related sentences was insufficient to support a downward departure. State v. Lacey, 553 So.2d 778 (Fla. 4th DCA 1989). Additionally, it would not be good policy for the legislature to punish those with families to support less than those without families. Cf. State v. Bray, 738 So.2d 962 (Fla. 2d DCA 1999) (holding that the fact that a defendant had a child to support did not support a downward departure).
Reversed and remanded.
FULMER and DAVIS, JJ., Concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Section 316.1934(2), Florida Statutes (1997), provides for the following presumptions regarding impairment: (1) if the blood alcohol level is .05 percent or less, there is a presumption the defendant is unimpaired; (2) if the blood alcohol level is greater than .05 but less than .08 percent, there is neither a presumption the defendant is impaired nor that the defendant is unimpaired; (3) if the blood alcohol level is greater than .08 percent, there is a presumption the defendant is impaired.
[3] The trial court based this finding on expert testimony that exposure to heat over time might impact the alcohol content of the blood sample. State v. Miles, 775 So.2d 950, 954-55 (Fla.2000). Both Rafferty's expert and the FDLE crime laboratory analyst offered similar testimony in this case.