DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOHN GOODMAN,**
Appellant,

v.

**FLORIDA DEPARTMENT OF LAW ENFORCEMENT,**
Appellee.

No. 4D14-3263

[May 25, 2016]

Appeal from the Florida Division of Administrative Hearings; L.T. Case No. 14-1918RX.

Jane Kreusler-Walsh and Stephanie L. Serafin of Kreusler-Walsh, Compiani & Vargas, P.A., West Palm Beach; Brian A. Newman of Pennington, P.A., Tallahassee; and Elizabeth L. Parker of Law Office of Elizabeth Parker, P.A., Palm Beach Gardens; for appellant.

Ann Marie Johnson, Tallahassee, for appellee.

FORST, J.

Appellant John Goodman was involved in a vehicular collision that resulted in the death of another individual. Appellant's blood was drawn after the accident for blood alcohol testing, pursuant to Florida's implied consent statutes. *See* §§ 316.1932-34, Fla. Stat. (2010). Ultimately, Appellant was charged with DUI Manslaughter/Failed to Render Aid and Vehicular Homicide/Failed to Give Information or Render Aid. As part of his defense, Appellant moved to exclude the blood alcohol test results, challenging Florida Administrative Code Rules 11D-8.012 and 11D-8.013 and the authority of the Florida Department of Law Enforcement ("FDLE") to promulgate these rules relating to the collection and labeling of blood for blood alcohol content testing. The trial court deferred ruling on the motion and transferred this issue to the Florida Division of Administrative Hearings, under the doctrine of primary jurisdiction.[1] An administrative

_____

[1] "The doctrine of primary jurisdiction dictates that when a party seeks to invoke the original jurisdiction of a trial court by asserting an issue which is beyond the ordinary experience of judges and juries, but within an administrative agency's

law judge ("ALJ") held an evidentiary hearing and dismissed Appellant's petition, finding that the challenged rules were valid exercises of delegated legislative authority, i.e., FDLE has the authority to govern the collection of blood and that Rule 11D-8.012 and Rule 11D-8.013 are valid exercises of agency rulemaking that ensure reliable blood alcohol test results.

Subsequently, the trial court denied Appellant's motion to exclude the blood test results. Appellant was ultimately convicted of the above-noted charges and sentenced.[2]

Appellant now appeals the ALJ's order and raises three issues: (1) the FDLE lacked delegated authority to promulgate the rules at issue; (2) Rule 11D-8.012 constitutes an invalid exercise of delegated legislative authority because it fails to establish standards for the method by which blood is collected for chemical analysis; and (3) Rule 11D-8.013 constitutes an invalid exercise of delegated legislative authority because it fails to incorporate a process to identify and/or exclude unreliable blood samples from the testing process. We affirm the first issue without further comment. *See State v. Bender*, 382 So. 2d 697, 699 (Fla. 1980) (finding that the pertinent statutes "direct law enforcement to use only approved techniques and methods . . . to ensure reliable scientific evidence for use in future court proceedings . . . ."). We write to explain our reasons for affirming on the other two challenges to the rules.

## BACKGROUND

As noted above, Appellant challenges the legitimacy and sufficiency of two FDLE regulations: Rules 11D-8.012 and 11D-8.013. These regulations govern the collection and storage of blood samples for the FDLE's blood alcohol testing program, as well as regulate those persons qualified to test the samples. Rule 8.012 specifies a number of steps that must be taken during the blood collection and testing process, including, *inter alia*, that the skin must be cleansed with a non-alcohol antiseptic before collection, that the samples "must be collected in a glass evacuation tube that contains a preservative," that "the tube must be inverted several times" and labelled properly, and that the samples must be refrigerated if they are stored for more than seven days. However, the rule does not set standards either for the type and size of needle to be used or the tourniquet application protocol to be followed in the collection of a blood sample for

---

special competence, the court should refrain from exercising its jurisdiction over that issue until such time as the issue has been ruled upon by the agency." *Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1036-37 (Fla. 2001).

[2] Appellant's appeal of his conviction and sentence is proceeding separately.

testing.  Rule 8.013 lays out the requirements for a Florida blood analyst permit, and further sets forth the blood alcohol testing analytical procedures.  This rule fails to explicitly require the analysts to screen for and reject compromised blood samples, or to document irregularities in the tested samples.

These deficiencies, Appellant argues, render the regulatory scheme insufficient to ensure the reliability of the blood alcohol test results.  However, as described below, Appellant's argument is an overbroad solution in search of a problem that does not exist.

**ANALYSIS**

## A. Challenge to Rule 11D-8.012

"In an appeal from final administrative action, this court reviews the administrative agency's findings of fact to determine whether they are supported by competent, substantial evidence."  *Dorcely v. State Dep't of Bus. & Prof. Regulation*, 22 So. 3d 834, 836 (Fla. 4th DCA 2009).  "We review the agency's conclusions of law de novo."  *Id.*  In a challenge to an existing rule, the burden is on the petitioner to demonstrate that the rule is invalid.  *See* § 120.56(3)(a), Fla. Stat. (2010); *State Dep't of Children & Family Servs. v. I.B.*, 891 So. 2d 1168, 1171 (Fla. 1st DCA 2005).

By law, persons accepting drivers' licenses in the state are deemed to consent to testing of their blood alcohol content.  § 316.1932(1)(a)1.a., Fla. Stat. (2010).  The "underlying purpose of the implied consent law . . . 'is to ensure reliable scientific evidence for use in future court proceedings and to protect the health of those persons being tested . . . .'"  *State v. Miles*, 775 So. 2d 950, 953 (Fla. 2000) (emphasis omitted) (quoting *Bender*, 382 So. 2d at 699).  Furthermore, compliance with the FDLE regulations gives rise to various statutory presumptions for use in court proceedings.  When a regulation fails to meet the purposes of the implied consent program, however, the statutory presumptions do not apply.  *See id.* at 953-55 (holding that failure to require proper preservation of blood samples rendered a prior version of Rule 8.102 "inadequate and inconsistent with the purpose of the implied consent law as it relates to ensuring the reliability of test results.  As such, the State [was] not entitled to the presumptions of impairment associated with the implied consent statutory scheme.").

Appellant argues that Rule 8.012 is invalid for failure to specify a required needle size for drawing blood.  Specifically, he alleges that his blood was drawn using a twenty-five gauge butterfly needle, rather than a

3

"standard" twenty-one gauge straight needle. A twenty-five gauge needle is narrower than a twenty-one, and, unlike a straight needle, which injects blood directly into the vial, a butterfly needle delivers blood to the collection vial via a small length of rubber tubing. Although the standard kits used by law enforcement contain the twenty-one gauge straight needles, the twenty-five gauge butterfly needles can be useful for certain patients.

At the proceedings below, the administrative law judge heard testimony from seven expert witnesses, all of whom opined on the relative effectiveness of this deviation in needle size and type and/or the effectiveness of the procedures in place under the current regulations. The testimony established that the use of a smaller butterfly needle to draw a suspect's blood can have several effects on a blood sample, such as increased blood clotting or hemolysis (the release of the contents of red blood cells into the surrounding plasma).[3] Experts for both parties testified, and the administrative law judge found, that the use of a smaller needle is more likely to cause blood to clot in the delivery from the donor to the test tube in which the blood will be stored (at which point anti-coagulation measures are employed to prevent new or further coagulation). However, because the administrative law judge found that an accurate result being obtained from clotted blood was not "inevitably precluded," he determined that Rule 11D-8.102 was valid.

Although the testimony presented at the hearing was subject to multiple conclusions on this point, there was sufficient evidence in the record to support the ALJ's findings of fact as to the effect of clotting on the accuracy of blood testing. First, the testimony was clear that a smaller needle can increase clotting, and that clotting can affect the accuracy of a blood alcohol test. However, one expert testified that it is still possible to get an accurate result from testing a properly prepared sample even after clotting had occurred because the clot does not add or subtract anything from the blood that would affect the test.[4] He referred to this homogenization process as "[v]ery easy" and testified that a clotted sample is neither "contaminated" nor necessarily an unreliable input into the

---

[3] On appeal, Appellant has focused his arguments with respect to Rule 8.012 solely on the increase in clotting caused by a smaller needle and deficient tourniquet usage.

[4] *See also* Derrick J. Pounder & Alan Wayne Jones, *Post-Mortem Alcohol — Aspects of Interpretation, in* FORENSIC ISSUES IN ALCOHOL TESTING 65, 66 (Steven B. Karch ed. 2008) ("The presence of blood clots will not necessarily have a negative influence on the accuracy of the blood alcohol analysis using headspace gas chromatography.").

scientific analysis. Further testimony revealed that homogenization was necessary only with larger clots, because "small clots . . . would have no affect [sic] on the blood alcohol test." These large clots would be easily noticeable, based on the testimony that grossly clotted blood would be difficult to move through the needles or pipettes. Regardless of the size of the clot, testimony also revealed that standard practice is to "mix[ ] the sample" prior to testing, in order to avoid problems such as those created by clots.

The takeaway point from this expert's testimony is that "a sample collected using a 25-gauge butterfly needle [is] valid for blood alcohol determination using headspace gas chromatography" so long as proper procedures are followed, and that Rule 8.012 is not invalid for failure to specify a required needle size for drawing blood. *See State v. Friedrich*, 681 So. 2d 1157, 1161-63 (Fla. 5th DCA 1996) (finding that, so long as the Intoxilyzer breath tests were made in substantial compliance with the applicable statutes and rules and the results of the tests "are sufficiently reliable so as to be generally acceptable in the scientific community," the court could not "say FDLE is remiss for not adopting rules or protocols in this regard"). Thus, the testimony established that clotting is notably different than the flaws caused by the lack of refrigeration in *Miles*, which could not be rectified after the fact. *Miles*, 775 So. 2d at 954-55. This testimony was sufficient for the ALJ to find that clotting, even when increased by the use of a smaller butterfly needle, does not inherently render blood alcohol testing inaccurate, as there were commonly known and utilized curative procedures.

**B. Challenge to Rule 11D-8.013**

Appellant also argues that Rule 8.013 improperly fails to require the screening, removal, or documentation of flawed blood samples. FDLE responds, and we agree, that Appellant has not established that the Rule has failed to ensure the accuracy of the blood testing program. The Rule itself, titled "Blood Alcohol Permit — Analyst," sets out criteria to apply for a permit to conduct blood alcohol analyses, including submission of an application providing "[a] complete description of proposed analytical procedure(s) to be used in determining blood alcohol level." The applicant's "proposed analytical procedures" are then reviewed by the Department.

Appellant called two witnesses who actually conducted blood tests for the Palm Beach County Sheriff's Office. Both testified that they routinely documented any irregularities in blood samples. Another expert, who had analyzed thousands of blood samples, stated that he always made written

documentation if a sample was clotted and required analysts working under him to do the same. That second expert, who was in fact the person who tested Appellant's blood in this case, specifically stated that "any time a sample is clotted, it is documented on the analyst's case file and is also reported . . . [a]s additional remarks under the conclusions."[5] Yet another expert testified that in his tens-of-thousands of samples tested, he always noted when a sample was clotted, but had also always been able to properly test the blood after making that notation. This testimony supports FDLE's contention, both below and on appeal, that Rule 8.013 is not meant to be the only source of guidance for analysts, but is instead meant to supplement and reinforce sound scientific principles and laboratory practices. It also supports the ALJ's conclusion that "analysts routinely examine and document the condition of samples as a matter of standard laboratory practice [and the] omission of such a requirement does not provide a basis to invalidate [Rule 8.013]."

Any attempt by FDLE to regulate for *every* possible contingency that may arise in the collection or testing processes would swiftly devolve into a hopeless endeavor and serve only to expand the Department's regulations to epic lengths.[6] Furthermore, such over-regulation would run the risk of locking in today's current scientific methodology, preventing the evolution and improvement of the system. It would also deprive both the State and criminal defendants of the expertise and discretion of the analysts, as their training and practical experience is necessary to properly address the wide variety of factual scenarios that may arise.[7] For instance,

---

[5] Appellant has failed to provide a copy of his report as part of the record on appeal. We therefore do not know whether Appellant's blood was in fact clotted.
[6] No other state appears to have regulated to the extent that Appellant argues Florida must. Appellant has not provided, and we have failed to locate, a single rule across the country that regulates the exact size of needle that must be used. Instead, the rules simply provide general guidance clearly intended to be supplemented by standard best practices and medical knowledge. *See, e.g.,* Miss. Admin. Code 31-5-2:1750.000 et seq. (2016) (adopting rules regulating blood collection without specifying a particular needle size to be used); § 577.029, Mo. Rev. Stat. (2016) (requiring use of a "previously unused and sterile needle"); Mont. Admin. R. 23.4.220 (2016) (adopting rule with similar requirements to FDLE rule); N.H. Code Admin. R. Saf-C 6402.02 (2016) (same); Ohio Admin. Code 3701-53-05 (2016) (requiring blood to be drawn "with a sterile dry needle"). With regards to the screening of blood, we have found only one state—Maine—which specifically requires analysts to document clots found in testing samples. *See* 10-144 Ch. 270 Me. Code. R. § B(3)(e) (2016).
[7] *See* Edward J. Imwinkelried, *Some Preliminary Thoughts on the Wisdom of Governmental Prohibition or Regulation of Employee Urinalysis Testing,* 11 Nova L. Rev. 563, 596-97 (1987) (calling for government regulation of laboratories, but

we would be loath to require the FDLE to mandate a single, one-size-fit-all needle choice for blood collection, as the unique facts of each case may require a different choice. This determination is best left for the trained professionals on the ground, as are many of the choices made in the testing laboratories across the State. The rules at issue, when combined with basic laboratory practices, are sufficient to protect the safety and interests of the court system and defendants alike. *See Wissel v. State*, 691 So. 2d 507, 507-08 (Fla. 2d DCA 1997) (holding "that procedures that are implicit and incidental to procedures otherwise explicitly provided for in a properly adopted rule or regulation do not require further codification by a further adopted rule or regulation [and] to hold otherwise belies statutory intent . . . ." and that such an argument, "based on the lack of a rule or regulation to cover every step of the testing procedures . . . is not only speculative and theoretical, but also hyper-technical.").

## CONCLUSION

Appellant has failed to show that Rules 8.012 and 8.013 do not ensure the accuracy of the blood testing program. The ALJ's and trial court's determinations that these rules adequately protect the reliability and consistency of blood testing were supported by competent evidence in the record on appeal. For these reasons, we affirm the administrative law judge's order.

*Affirmed.*

WARNER and STEVENSON, JJ., concur.

*　　*　　*

***Not final until disposition of timely filed motion for rehearing.***

---

only going so far as to argue that the laboratories should themselves establish specific internal quality control procedures based on more general regulations).